1

2

3

4

5

6

7

8

9        **UNITED STATES DISTRICT COURT**

10      **CENTRAL DISTRICT OF CALIFORNIA-SOUTHERN DIVISION**

11

12   JAMES TROY WILLIAMS,            )     Case No. SA CV 16-02141-AS
                                     )
13              Plaintiff,           )     **MEMORANDUM OPINION AND**
                                     )     **ORDER OF REMAND**
14                                   )
                                     )
15        v.                         )
                                     )
16   NANCY A. BERRYHILL,[1] Acting   )
     Commissioner of Social         )
17   Security,                       )
                                     )
18              Defendant.           )
     _____)

19

20                         **PROCEEDINGS**

21

22        On December 1, 2016, *pro se* Plaintiff, James Troy Williams, filed

23   a Complaint seeking review of the denial of his application for

24   Disability Insurance Benefits. (Docket Entry No. 1). The parties have

25   consented to proceed before the undersigned United States Magistrate

26   Judge. (Docket Entry Nos. 8-9). On April 14, 2017, Defendant filed an

27

28   _____

          [1]    Nancy A. Berryhill is now the Acting Commissioner of the
     Social Security Administration and is substituted in for Acting
     Commissioner Caroyln W. Colvin in this case. See 42 U.S.C. § 205(g).

                              1

Answer along with the Administrative Record ("AR"). (Docket Entry Nos. 15-16). On July 13, 2017, Plaintiff filed a "Memorandum of Points and Authorities in Support of the Plaintiff's Motion for Summary Judgment" ("Plaintiff's Brief"). (Docket Entry No. 20). On August 14, 2017, Defendant filed a "Memorandum in Support of Defendant's Answer" ("Defendant's Brief"). (Docket Entry No. 22). On August 31, 2017, Plaintiff filed a Reply Brief. (Docket Entry No. 23).

The Court has taken this matter under submission without oral argument. See C.D. Cal. L.R. 7-15; "Order Re: Procedures in Social Security Case," filed December 6, 2016 (Docket Entry No. 6).

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

On June 17, 2011, Plaintiff, formerly employed as an interior designer for homes and as a sales representative for a ceramic tiles company (see AR 53, 104, 322, 366-77), filed an application for Disability Insurance Benefits, alleging an inability to work because of his disabling condition since October 1, 2009. (AR 298-99).

On January 31, 2013, Administrative Law Judge Keith Dietterle ("ALJ Dietterle"), heard testimony from Plaintiff (who was represented by counsel) and vocational expert Alan Boroskin. (See AR 50-69). On March 5, 2013, ALJ Dietterle issued a decision denying Plaintiff's application. (See AR 133-41). After determining that Plaintiff had

2

severe impairments -- "sleep apnea, hypothyroidism, obesity, and affective disorder" (AR 135) -- but did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listed Impairments (AR 135-36), ALJ Dieterle found that Plaintiff had the residual functional capacity ("RFC")[2] to perform medium work with the following limitations: frequent postural functions; no exposure to unprotected heights and dangerous or fast-moving machinery; and work involving only simple, routine tasks.  (AR 136-39).  ALJ Dieterle then determined that Plaintiff was not able to perform any past relevant work (AR 139), but that Plaintiff could perform jobs existing in significant numbers in the national economy, and was therefore not disabled within the meaning of the Social Security Act. (AR 139-40).

Plaintiff requested that the Appeals Council review ALJ Dieterle's decision.  (See AR 216-17).  On August 25, 2014, the Appeals Council vacated ALJ Dieterle's decision and remanded the matter in order for the Administrative Law Judge to do the following: (1) "Obtain additional evidence concerning the clamant's musculoskeletal impairment in order to complete the administrate record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence"; (2) "Further, if necessary, obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairment";

---

[2]    A Residual Functional Capacity is what a claimant can still do despite existing exertional and nonexertional limitations.  See 20 C.F.R. § 404.1545(a)(1).

(3) "Further evaluate the claimant's musculoskeletal disorder with reference to the pertinent evidence of record, including the claimant's treatment history"; and (4) "If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base[.]" (See AR 149-50).

On July 21, 2015, another Administrative Law Judge ("ALJ"), Joan Ho, heard testimony from Plaintiff (who was represented by ocunsel), medical expert Ronald Kendrick and vocational expert Jeanine Metildi. (See AR 72-09). On Sepember 4, 2015, the ALJ issued a decision denying Plaintiff's application. (See AR 22-37). After determining that Plaintiff had severe impairments -- "obesity; degenerative disc disease of the cervical spine; cervical spondylosis; degenerative disc disease of the lumbar spine; and major depressive disorder" (AR 25-26)[3] -- but did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listed Impairments (AR 26-27), the ALJ found that Plaintiff had the RFC to perform a range of sedentary work[4] with the following limitations: can lift and/or carry up

---

[3]     The ALJ found that Plaintiff's hypothyroidism, low testosterone, sleep apnea and upset stomach to be were nonsevere impairments, and that Plaintiff's fibromyalgia and bipolar disorder were not medically determinable impairments. (AR 25).

[4]     "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary
(continued...)

to 15 pounds occasionally and 10 pounds frequently; can stand and/or walk 4 hours and sit for 6 hours during an 8-hour workday with normal breaks; cannot climb ramps, stairs, ladders, ropes and scaffolding; can bend, stoop, kneel, crouch and crawl occasionally; can reach in all directions, including overhead, frequently; can use hands and fingers bilaterally frequently; cannot be exposed to workplace hazards such as dangerous moving machinery and unprotected heights; limited to simple, routine and repetitive tasks, but can sustain attention and concentration skills sufficient to carry out work-like tasks with reasonable pace and persistence; and can interact with co-workers, supervisors and the general public occasionally. (AR 27-34). The ALJ then determined that Plaintiff was not able to perform any past relevant work (AR 35), but that Plaintiff could perform jobs existing in significant numbers in the national economy and was therefore not disabled within the meaning of the Social Security Act. (AR 35-36).

Plaintiff requested that the Appeals Council review the ALJ's decision. (See AR 17). The request was denied on October 14, 2016. (See AR 1-5). The ALJ's decision then became the final decision of the Commissioner, allowing this Court to review the decision. See 42 U.S.C. §§ 405(g), 1383(c).

//

//

---

[4] (...continued)
criteria are met." 20 C.F.R. §§ 404.1567(a).

**PLAINTIFF'S CONTENTIONS**

Plaintiff alleges that the ALJ failed to properly: (1) assess Plaintiff's credibility; (2) assess certain medical medical evidence (including the opinion of one of Plaintiff's treating physicians); (3) evaluate the medical expert's testimony or consider the written objection to the medical expert's testimony; (4) assess the opinions of several of Plaintiff's treating physicians; (5) determine Plaintiff's RFC; and (6) consider Plaintiff's mental impairments. (<u>See</u> Plaintiff's Brief at 2-23; Reply Brief at 2-7).

**DISCUSSION**

After consideration of the record as a whole, the Court finds that Plaintiff's first claim of error warrants a remand for further consideration. Since the Court is remanding the matter based on Plaintiff's first claim of error, the Court will not address Plaintiff's second through sixth claims of error.

**A.   The ALJ Did Not Properly Assess Plaintiff's Credibility**

Plaintiff asserts that the ALJ erred in finding that Plaintiff's testimony about his pain was not credible. (<u>See</u> Plaintiff's Brief at 2-9; Reply Brief at 2-4).   Defendant asserts that the ALJ properly

considered Plaintiff's testimony and found Plaintiff not fully credible. (See Joint Stip. at 14-17).

Plaintiff made the following statements in a "Function Report - Adult" dated July 28, 2011 (see AR 335-42):

He lives alone in an apartment, but he is going to move in with a friend or family in September 2011 because he can no longer afford it. He does not take care of anyone else or pets (he had to give away a dog because he was unable to take care of the dog). (See AR 335-36, 342).

As a result of his impairments, he no longer is able to swim, dance, take long walks or hikes, work out, work, or engage in social functions. His impairments affect his sleep; he has difficulty falling asleep, he has bad nightmares, he does not sleep well, and he feels paralyzed when he wakes up. His impairments affect his abilities to bathe (he can only shower, and bathing makes him fell light-headed), to care for his hair (his hair has become oily and itchy), and to shave (shaving causes itching and a burning sensation). Although he does not need special reminders to take care of personal needs and grooming, he often puts them off until later in order to sleep more or feel better (which does not happen). He needs

special reminders to take medicine (he forgets whether or not he has already taken medicine).  (See AR 336-37).


He prepares his own meals, simple things likes sandwiches and frozen dinners (i.e., spaghetti, soup, rice and beans). Once a day he makes semi-prepared hot food (which takes 15 to 20 minutes), and the rest of his meals must be ready-made. His impairments have made him cook less because of his low energy level.  His househould chores are hand-washing dishes (5 minutes), laundry (5 minutes), and vaccuuming once in a while (10 to 15 minutes).  He cannot do outdoor work because of the heat and physical exertion.  He goes outside when necessary, to get mail, go to doctors' appointments, and get groceries, driving a car ("[q]uick trips in my immediate vicinity").  He shops in stores only for groceries, every week or two (30 to 40 minutes).  He is able to pay bills, count change, handle a saving account, and use a checkbook or money orders.  (See AR 337-39).


He no longer does his hobbies and interests, namely, swimming, biking, hiking, long walks and long car trips, because he is short of breath, exhausted, has muscle fatigue and is overwhelmed.  He spends time with others, talking on the phone once a day, and getting together with a friend once a week.  He does not go to any places on a regular basis, and

he does not feel well enough to attend social functions. He has problems getting along with others because he does not feel like his "old self" and is irritable, less patient, depressed, anxious and nervous. (See AR 339-40).

His impairments affect his lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair-climbing,, and getting along with others. His joints are tight and sore all the time, he feels shortness of breath and light-headed, he has hot flashes and sweats profusely, and his strength "can give-out depending on [his] emotions." He can walk for 10 minutes before he has to rest, and then must rest for at least 3 minutes before he can resume walking. He cannot finish what he starts; he falls asleep during conversations and television shows. He can pay attention well, and he believes he can follow follow written and spoken instructions well. He usually gets along fine with authority figures, and he has never been fired or laid off from a job because of problems getting along with other people. He does not handle stress well (ruminating thoughts make it more difficult for him to sleep). He does not handle changes in routine well. (See AR 340-41).

Plaintiff testified at the January 31, 2013 administrative hearing as follows (see AR 52-65):

He has a Bachelor's degree from the Interior Designers Institute. He lived by himself until he moved back in with his parents about a year ago (for financial reasons). He last worked in July 2008 as an interior designer kitchen and project designer, which consisted of 1/3 walking, 1/3 sitting and 1/3 standing and required him to lift and carry 100 pounds (large tile and flooring samples). During the past 15 years all of his jobs had been in interior design and had roughly the same walking, sitting, standing, lifting requirements. He is 6'4 1/2" tall and weighs 330 pounds (his normal weight is 220 pounds; he gained 80 pounds during a 9-month period in 2009 as a result of hypothyroidism). He has difficulty sleeping and has sleep apnea (he uses a CPAP which helps but is not perfect). As a result of his thyroid (metabolism) problem, he goes to bed between 3 a.m. and 5 a.m. (before he falls asleep he just lies in bed for 2 to 3 hours; he has tried activities like reading and watching television, but sometimes they just overstimulate him), and he is tired in the morning because his mind is racing. He sees Dr. Molina for his hypothyroidism every two weeks or at least once a month, and he takes a synthetic form of Levothyroxine (and has tried a natural remedy, Armour, which apparently did not work). He has problems with chronic fatigue, and naps for about an hour or two during the day (he sometimes has to pull his car over to the side of the ride to take a nap). (See AR 52-57).

He has severe depression; he becomes extremly withdrawn and has suicidal ideations. He sees a psychiatrist for his depression. He does not have hallucinations. (See AR 59-61).

He has pain in his neck and has headaches, and sees Dr. Demner for treatment. The pain travels from his neck to the base of his spine. He has had to go to the emergency room every three months on average. He has used a TENS unit at least 4 times a week since 2003. He also has used heat, ice and muscle relaxers. For pain management, he has received trigger point injections and epidurals in his upper and lower thoracic. The past 2 months he has had two epidurals, which provided him relief for about a week. Dr. Demner has recommended a spinal fusion joining the neck and the cervical spine. He is considering it, but his insurance requires him to go to physical therapy for 6 months to one year. (See AR 62-64).

He does not have any difficulty with dressing or bathing. He has difficulty putting on his shoes, but he usually wears slip-on shoes. He does minimal household chores -- making his bed, cleaning the kitchen countertop, laundry, things that do not require much bending. He can drive for a maximum of 20 minutes (he begins to feel drowsy). He can sit in a chair (depending on its comfort) for about 2 hours. He can walk for

11

2 blocks. He does not use any assistive device. He can lift 75 pounds if he is standing upright (i.e., a box on a counter); he cannot lift that weight if it is on the ground and he has to bend (it would cause him pain or to spasm later). (See AR 57-59).

His circle of friends has been reduced to one or two people. He goes out with his friends about once every three months, and goes out to eat about once a month. He does not have any hobbies, and does not belong to any clubs or social organizations. He reads the news on the computer every day (about 30 minutes). (See AR 60-61).

His energy level and sleepiness would keep him from being able to do a simple job on a full-time basis. He sometimes has good days, but more often has bad days. 2 times a week he cannot get out of bed and get himself going. He just lies down because his back hurts or because his pain and depression are overwhelming. (See AR 64-65).

Plaintiff testified at the July 21, 2015 administrative hearing as follows (see AR 75-76, 84-102):

He is single, lives with his parents in a house, is 6'4" tall, and weighs 330 pounds. He drives three to four times a

week, usually to the grocery store.  His parents drove him to the hearing.  (See AR 76).


He stopped working because he was laid off.  When asked if he would have continued to work had he not been laid off, he responded, "My health was deteriorating and I was going to many, many doctors at the time, so when I was laid off I thought oh, great, now I can concentrate on my health.  At that time, he was having problems with primarily his back (cervical spine and lumbar spine), and he was going to (with insurance) physical therapy twice a week and to the chiropractor once a week.  From July 2008 to the end of 2013, his back problems became much worse –- he got severe spasms, shooting nerving pain (from his lower back down to his feet) that would cause him to go off-balance and fall, and burning sensations in his feet.  From July 2008 to the end of 2013, his neck pain became worse –- the nerve became more compressed, and the pain became a shooting, radiating pain over his head and way down his back.  His neck pain affects his ability to move his neck side to side or tilting.  Many neurosurgeons have recommended surgery on his neck, and the plan is to proceed with a neck fusion (but a neurologist still needs to say how many neck segments need to be fused).  Prior to the end of 2013, he had hypothyroidism for about a year and a half.  His hypothyroidism levels have been stable since

2010, but he still has various symptoms, such as voice hoarseness, skin problems, heavy rosacea (which he treats with ointments), and constipation. Prior to the end of 2013, he had fibromyalgia which has been an all-over body ache causing pain between a level 6 to a level 8. (See AR 84-90).

Prior to the end of 2013, he could stand for 3 minutes before he started feeling pain, and after standing for about 10 minutes he needed to sit down or change his position. Now he can only stand for about 5 minutes before spasms begin and he has to change position. He also needs to change position if he sits for too long. He has problems with concentration; noises and lights easily break his attention span. (See AR 90-92).

At the beginning of his hypothyroidism, his psychiatric care was well-managed with mood stabilizers and anti-depressants; he saw Dr. Batagleno at least every 2 weeks for about six months. However, prior to the end of 2013, he had severe depression, severe anxiety and irrational fears -- his anxiety became uncontrollable, the combination of pill cocktails he was taking did not continue to work (different doctors changed his medications), he would talk himself out of doing things like getting out of the house, and he ultimately

isolated himself.  His mental health issues have stabilized. (See AR 92-93, 99-100).

With respect to daily activities from July 2008 to the end of 2013, he stayed home laying flat on his back an average of 4 to 5 hours a day, watching television, taking online courses, talking to friends.  He also would have to lie down if he had sit and/or stood for an hour and a half.  He was able to do laundry and dishes until 2011 or 2012; since he cannot bend lower than his waist, the only thing he now is able to do is clean his own dish (meaning, wash it, put it on the counter, and a family member puts it in the dishwasher). He took one or two online courses (i.e., graphic design, real estate, art history) every semester; he took the courses because they forced him to focus and engage in something, and he did okay (meaning, he got C grades).  He also went in for some classes.  (See AR 93-95, 101-02).

Although he used to use hot and cold packs for pain relief, he now uses only cold packs on his lower back and neck because of his skin issues.  Prior to the end of 2013, he took Flexeril and Naprosyn and then started taking Percocet in November 2013.  With the Flexeril and Naprosyn he was able to get out of bed and perform basic functions.  In November 2012, he reported to his physician, Dr. Demner, that he had an

average pain level of 5 to 6 (but he claims that he actually had an average pain level of 8 but that Dr. Demner tried to minimize his condition).  He now is taking Norco and muscle relaxers.  He has had multiple trigger-point epidurals on both his cervical and lumbar spines; the relief lasted for about two weeks.  (<u>See</u> AR 95-96).

After briefly discussing Plaintiff's testimony at the two administrative hearing as well as a consultative examiner's notation (<u>see</u> AR 28)[5], the ALJ addressed Plaintiff's credibility as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, but that his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

> In finding the claimant's allegations not entirely credible, the undersigned notes they are not fully supported by or consistent with the medical evidence of record.

---

[5]     With respect to the consultative examiner's notation, the ALJ wrote, "The undersigned also notes the claimant told a consultative examiner he spends 90 percent of his day lying in bed, getting up only to eat and go to the bathroom (Exhibit 10-F, p. 5)."

(AR 28).

The ALJ proceeded to discuss the medical evidence relating to Plaintiff's physical impairments. (See AR 28-29). The ALJ then addressed Plaintiff's credibility regarding his mental impairments as follows: "The undersigned also notes the evidence does not fully support his allegations regarding his mental health issues." (AR 29). The ALJ proceeded to discuss the medical evidence relating to Plaintiff's mental health impairments. (See AR 30).

The ALJ continued to address Plaintiff's credibility as follows:

> In finding the claimant's allegations not entirely credible, the undersigned also notes the claimant has made some inconsistent statements and has provided some information suggesting he was not as limited as he has alleged. He has stated, for example, that he does not have any difficulty taking care of his personal needs, is able to drive, sit for two hours at a time, and lift up to 75 pounds as long as he does not have to bend. During the July 21, 2015 hearing, the claimant testified he drives three or four times a week to the grocery store. He also acknowledged he stopped working because he was laid off, not because of his medical problems. He also testified he goes out with friends, spends time on the computer, does chores such as washing his dishes, and has taken

17

and passed an online class every semester. While the claimant's ability to perform these activities does not necessarily establish he was capable of obtaining and maintaining employment through his date last insured, his ability to perform these activities does indicate he was not as limited as he has alleged and that he was not, in fact, spending 90 percent of his time lying in bed.

(AR 30).


A claimant initially must produce objective medical evidence establishing a medical impairment reasonably likely to be the cause of the subjective symptoms. Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991). Once a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his or her pain and symptoms only by articulating specific, clear and convincing reasons for doing so. Brown-Hunter v. Colvin, 798 F.3d 749, 755 (9th Cir. 2015)(citing Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)); see also Smolen, supra; Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997). Because the ALJ does not cite to any evidence in the record

of malingering, the "clear and convincing" standard stated above applies.

Here, the ALJ failed to provide clear and convincing reasons for finding that Plaintiff's testimony about the intensity, persistence and limiting effects of his symptoms was not entirely credible.[6]

First, the ALJ failed to "specifically identify 'what testimony is not credible and what evidence undermines [Plaintiff's] complaints.'" <u>Parra v. Astrue</u>, 481 F.3d 742, 750 (9th Cir. 2007) (quoting <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995)); <u>see</u> <u>also</u> <u>Smolen</u>, <u>supra</u>, 80 F.3d at 1284 ("The ALJ must state specifically what symptom testimony is not credible and what facts in the record lead to that conclusion").

Second, the ALJ's determination that Plaintiff's testimony about his physical impairments and mental impairments was not fully supported by the medical evidence was an insufficient reason for finding Plaintiff less than fully credible with respect to his testimony about the severity of her physical and mental impairments. Once a claimant demonstrates medical evidence of an underlying impairment, "an ALJ 'may

---

[6]     The Court will not consider reasons for finding Plaintiff not entirely credible (<u>see</u> Defendant's Brief at 2-5) that were not given by the ALJ in the Decision.  <u>See</u> <u>Connett v. Barnhart</u>, 340 F.3d 871, 874 (9th Cir.  2003)("We are constrained to review the reasons the ALJ asserts."; citing <u>SEC v. Chenery Corp</u>., 332 U.S. 194, 196 (1947), <u>Pinto v. Massanari</u>, 249 F.3d 840, 847-48 (9th Cir. 2001)); and <u>Garrison v. Colvin</u>, 759 F.3d 995, 1010 (9th Cir. 2014)("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely.").

not disregard [a claimant's testimony] solely because it is not substantiated affirmatively by objective medical evidence.'" <u>Trevizo v. Berryhill</u>, 862 F.3d 987, 1001 (9th Cir. 2017)(quoting <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 883 (9th Cir. 2006)).

Third, the ALJ's partial discrediting of Plaintiff's testimony based on his ability to perform certain daily activities, such as taking care of his personal needs, washing his dishes, driving, driving three or four times a week to the grocery store, sitting for two hours at a time, lifting up to 75 pounds if he does not have to bend, going out with friends, spending time on the computer, and taking and passing an online class every semester, was not a clear and convincing reason. <u>See Vertigan v. Halter</u>, 260 F.3d 1044, 1050 (9th Cir. 2001) ("[T]he mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled."); <u>Reddick</u>, <u>supra</u> ("Only if the level of activity were inconsistent with the Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.").

It is not clear whether the ALJ considered Plaintiff's testimony about his limited abilities to perform such daily activities (<u>see</u> AR 336 [Plaintiff testified he had issues with bathing, caring for his hair and shaving], AR 59 [Plaintiff testified he had difficulty putting on his shoes and socks], AR 337 [Plaintiff testified that hand-washing his

20

dishes took him 5 minutes], AR 95 [Plaintiff testified that since 2011/2012, he was only able to wash his own dish and place it on the counter], AR 338 [Plaintiff testified that he drove only for "[q]uick trips in [his] immediate vicinity], AR 338 [Plaintiff testified that a trip to the grocery store took 30 to 40 minutes], AR 58 [Plaintiff testified he could not drive for more than 20 minutes], AR 76 [although Plaintiff testified he drove three or four times a week to the grocery store, he did not state how long each trip took him], AR 76 [Plaintiff testified his parents drove him to the July 21, 2015 administrative hearing], AR 58 [Plaintiff testified he was able to sit for about 2 hours "[d]epending on the comfort of the chair"], AR 91 [Plaintiff testified that he had to adjust if he sat in a chair "for too long"], AR 58 [although Plaintiff testified that he could lift a maximum of 75 pounds if he was standing upright and did not have to bend, he did not testify about the number of times he could lift that amount of weight in that matter (and the ALJ did not not ask Plaintiff about his ability to lift at the January 31, 2015 administrative hearing); and he testified that lifting while bending would cause him a lot of pain], AR 339 [Plaintiff testified that he got together with a friend once a week], AR 60-61 [Plaintiff testified that he got together with friends once every three months], AR 92 [Plaintiff testified that his mental health issues caused him to "ostracize" or isolate himself], AR 61 [Plaintiff testified that he reads news on the computer for about 30 minutes daily], and AR 101-02 [although Plaintiff testified he took and passed online courses every semester, he testified he only received Cs, and he

did not testify about how much time the online courses took].  Moreover,

although, as noted by the ALJ, there is a statement in a January 3, 2012

consultative psychiatric examination report about Plaintiff spending 90

percent of his day lying down in bed (see AR 847-48),[7] Plaintiff was not

asked about that statement or the context of that statement at either

administrative hearing.  Therefore, the degree to which Plaintiff could

perform such daily activities may not have been inconsistent with his

testimony regarding his limitations.  See Reddick, supra; see also

Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 600 (9th

Cir. 1999)("If a claimant is able to spend a substantial part of his day

engaged in pursuits involving the performance of physical functions that

are transferable to a work setting, a specific finding as to this fact

may be sufficient to discredit a claimant's allegations.").


     Fourth, to the extent that the ALJ found that Plaintiff was not

entirely credible based on Plaintiff's testimony that he stopped working

because he was laid off, rather than because of his medical problems,

that reason was not clear and convincing.  Although Plaintiff's

testimony was unclear, his being laid off may have been related to his

deteriorating health situation (see AR 84).  Unlike Bruton v. Massanari,

268 F.3d 824, 828 (9th Cir. 2001)(finding that the ALJ's reliance, in

_____

     [7]    The statement relied on by the ALJ was the following: "When
asked to describe his usual daily activity, the clamant answered, 'Feel
like crap when waking for about two hours, however, is inconsistent from
day-to-day foggy and headache); mostly need to lie on bed staring at
ceiling because my back aches and I feel disgusting, this is 90% of my
day, interrupted by eating and bathroom trips.'" (underlining added for
emphasis).

22

part, on the claimant's false statements at the administrative hearing and to a doctor that "he left his job because he was laid off, rather than because he was injured"), a case relied on by Defendant (see Defendant's Brief at 4), there is no indication that Plaintiff gave false information about why he left his employment.

**B.    Remand Is Warranted**

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000). Where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. Id. at 1179 ("[T]he decision of whether to remand for further proceedings turns upon the likely utility of such proceedings."). However, where, as here, the circumstances of the case suggest that further administrative review could remedy the Commissioner's errors, remand is appropriate. McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2011); Harman v. Apfel, supra, 211 F.3d at 1179-81.

Since the ALJ failed to properly assess Plaintiff's credibility, remand is appropriate. Because outstanding issues must be resolved before a determination of disability can be made, and "when the record as a whole creates serious doubt as to whether the [Plaintiff] is, in

fact, disabled within the meaning of the Social Security Act," further administrative proceedings would serve a useful purpose and remedy defects. <u>Burrell v. Colvin</u>, 775 F.3d 1133, 1141 (9th Cir. 2014)(citations omitted).[8]

**ORDER**

For the foregoing reasons, the decision of the Commissioner is reversed, and the matter is remanded for further proceedings pursuant to Sentence 4 of 42 U.S.C. § 405(g).

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: October 10, 2017

/s/
ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

---

[8] The Court has not reached any other issue raised by Plaintiff except to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time. "[E]valuation of the record as a whole creates serious doubt that Plaintiff is in fact disabled." <u>See</u> <u>Garrison v. Colvin</u>, 759 F.3d 995, 1021 (2014). Accordingly, the Court declines to rule on Plaintiff's claims regarding the ALJ's errors in failing to properly (1) assess certain medical medical evidence (including the opinion of one of Plaintiff's treating physicians) (<u>see</u> Plaintiff's Brief at 9-15; Reply Brief at 4-5), (2) evaluate the medical expert's testimony or consider the written objection to the medical expert's testimony (<u>see</u> Plaintiff's Brief at 15-16; Reply Brief at 5), (3) assess the opinions of several of Plaintiff's treating physicians (<u>see</u> Plaintiff's Brief at 16-20; Reply Brief at 5-6), (4) determine Plaintiff's RFC (<u>see</u> Plaintiff's Brief at 20-22; Reply Brief at 6-7), and (5) consider Plaintiff's mental impairments (<u>see</u> Plaintiff's Brief at 22-23; Reply Brief at 7). Because this matter is being remanded for further consideration, these issues should also be considered on remand.